before we get started, I'll advise you that Justice Lytton is unable to attend this, be here this morning. However, he is on the panel and will be listening to oral arguments afterwards and will participate in the resolution of this matter. That being said, Mr. Clark. It please the court. I am Michael Clark. I represent the plaintiff appellant, Brenda Zack in this matter. Before I begin my arguments, I'd like to raise one little point. You know, please forgive me if I'm dabbing my eyes quite a bit during this. Uh, apparently I contracted an eye infection. Now with the court's permission, after I've finished my arguments, I'd like to take a moment and wipe things down here with these consideration of other counsel. Thank you. Appreciate it. Brenda Zack, uh, both individually and as co-trustee of the Robert and Jim Lackey trust. Ask this court to reverse the findings of the underlying circuit court. I think the issues in this case probably, uh, most easily understood if I just briefly recap the individuals involved in their relationships and one another. First, of course, we have Robert and Jim Lackey, husband and wife who had the great fortune of winning the Illinois state lotto. They decided to take the majority of that money through a 20 year payment. Of annual, uh, payments. I think it would arrive typically in January of a given year. And they finally ceased in 2017. Robert and Jim had four children, the appellant plaintiff, Brenda Zack, the defendant, Apple Lee, Suzette Mook, as well as Robin Johnson and Aloha Travelstead. Relative, relevant to this matter, Aloha Travelstead herself had four children. Those children were Sharon O'Dara Woods, Edwin Travelstead, Chad Travelstead, and most relevant here, Jeremy Travelstead. These four individuals then were the grandchildren of Robert and Jim. Jeremy Travelstead had two children. Xander and Sarah, the great grandchildren now of Robert and Jim. Now, after the birth of Xander and Sarah, Jeremy Travelstead married a woman named Rachel. She apparently took his name. She's Rachel Travelstead. And once Jeremy passed, she became his widow and executor of his estate. Upon this backdrop, we should note that in 2009, Robert passed away. His wife passed soon after in October of that same year. Now, Robert's trust spoke at the initial level about distributing money to all four of the children, including Robin. However, before her death, June amended her trust to effectively exclude Robin from receiving any benefits under that trust. As a result, though, Robin nonetheless was still receiving funds under the Robert Lackey Trust. Both of these trusts are administered by Brenda Zack and Suzette Mook. The first aspect of the circuit court's ruling I'd like to discuss is the court's decision with regard to removal of Suzette Mook as a co-trustee of the fund. I'm sorry, funds. We asked for reversal on that point. The trial court essentially found that there were insufficient circumstances to justify removal. The court's determination, we believe, was an error to the effect that the court decided that Mook exercised a requisite degree of care. We believe that was against the manifest weight of the evidence. Additionally, we believe that the circuit court's ruling is an abuse of discretion. As trustee, Suzette Mook owed certain duties to the trusts and the beneficiaries. One court has phrased it as the trustee having a duty to act with the utmost good faith and the highest degree of fidelity. It's also been described that the court will not suffer the remotest possibility of a conflict of interest, nor the faintest appearance of impropriety. We contend that there were many factors and instances which showed that Suzette Mook fell way below these standards. For purposes of this argument, I'd like to focus on just one particular aspect of that. The lawsuits which Suzette Mook filed against various beneficiaries. The first lawsuit that I'm going to discuss is her suit against Robin Johnson, her sister, a daughter of Robert and June. In this suit, Suzette Mook teamed up with the estate of Jeremy, which depending upon this court's decision, Jeremy's estate might ultimately be a beneficiary. She teamed up with the estate and sued Robin Johnson, alleging that Robin had forged certain documents in order to obtain proceeds under life insurance policy to which she would not have been entitled. This particular insurance policy was not part of the trust. Now in that suit, the jury awarded substantial damages in favor of Suzette Mook and against beneficiary Robin. Specifically, over $22,000 of compensatory and initially over 127,000 punitive damages. That amount was remitted, but the appellate court came back and sent it back with instructions. I do not know the ultimate result of that at this point. Nonetheless, as part of that judgment Suzette had against Robin, as a judgment creditor, she arranged for non-wage garnishment to be placed on both of the trusts. The trust which Suzette Mook was a co-trustee. Now, Ms. Mook ultimately relented and decided to distribute funds to Robin and other beneficiaries. But we think it's important that in this particular instance, that Suzette Mook teamed up with another potential beneficiary to file suit against a definite trust beneficiary and then directly affected the trusts by obtaining a non-wage garnishment order. The standard of her acting in good faith. Obviously she had a good faith belief that there was some impropriety with the signatures in the other case that I believe is still pending. And in that, I mean, was it found to be a frivolous suit?  Or how do you find that that is a breach of the duty as the fiduciary in this trust matter? There are several aspects. First, of course, Suzette Mook could have withdrawn as a co-trustee of the trust, if nothing else, prior to having a garnishment order issued on it. It appears clear that at least according to the jury, there was merit to the lawsuit. But what we'd like to point out then is this lawsuit is itself a conflict between Suzette Mook and the beneficiary and in a sense also the trust since she garnished it. Not only is there a conflict, we believe that the subminimum creates a definite appearance of impropriety. The trust act and the cases involving that indicate that when the principal, when the parents set these up by putting the children, making them as co-trustees, that they understand that there is the appearance of impropriety and that there is going to be a certain likelihood of a conflict. And that by including them, they sort of overcome that presumption. I know the trust act is going to change shortly, but that is one of the ways that we've sort of, by case law, overcome the issue of presumption. Because people make their family members and who are also beneficiaries, trustees. I mean, you know, she's not just acting for the benefit of, you know, one party, Robin, but she is tasked with acting in what's in the best interest of all the beneficiaries, right? I mean, so there's, because she is one of those beneficiaries, there's going to quite likely be a, you know, a conflict. But when the parents made her one of the co-trustees, they sort of overcome that presumption, right? I disagree. While the wording of the trust has been set up to, shall we say, in part predict that certain things might occur, we believe that the filing of this and yet another lawsuit went far beyond anything that might have been contemplated. The, this is not just a squabble similar to the one that might come up later as far as Suzette Luce's refusal to issue funds until her sister helped her clean the garage. This is quite different and above that type of situation. Because not only did Suzette file this lawsuit against Robin, she also filed another suit against Shannon Woods-Odera. Child of Aloha, a direct beneficiary. In that action, Ms. Moog sought to recover on an alleged debt, on a loan that apparently she had made to Shannon Odera. And ultimately that matter settled only once we had another beneficiary, Edwin Travelstead, agreed to pay that debt in the event that Robin had not by the time of Edwin's passing. We submit that these particular actions do not indicate an utmost good faith and highest degree of fidelity. Do not just create a possibility of conflict, but in fact establish an actual and definitive conflict. Between multiple beneficiaries and at the trust. We also submit that this created a clear appearance of impropriety on the part of Suzette Moog. Now the circuit court's ruling appeared to brush aside these various aspects of conflict. And in effect determined instead that it was not going to remove Suzette Moog for a few reasons. The first one was that at no time did Moog misappropriate any funds. It's not a claim that she absolutely did here. But the court's second opinion was that Moog did not fail to fulfill her responsibilities. It's hard to put that particular finding in context and reconcile it with the court's corresponding finding that Suzette Moog had technically breached her fiduciary duties as trustee. Possibly because of all the times that she demanded personal services or some other personal benefit before she would distribute any of the funds. I'd like to please, in that context then, I ask that the court reverse that aspect. Moving on to the second aspect, the proper distribution of assets, which otherwise would go to Jeremy unless he hadn't died. The circuit court held as a matter of law that the remaining funds should go to Jeremy's estate instead of Jeremy's children. We believe that was error. It is our contention that the assets should have gone to Jeremy's children. The ultimate goal is to discern the wishes of the settler and we contend that reading this agreement as a whole shows a clear and obvious intent to keep the benefits within the bloodline of the family. Only children, grandchildren and descendants are mentioned. There's no word about a spouse or an estate imperative. The provision with respect to upon the death of the beneficiary was a major reason for what the court determined in how to distinguish this. However, in doing that, the circuit court specifically implied, at least, that it was not concerned about what the intent of Robert McJune might have been. It was just going to apply rules of construction. We believe that was incorrect and that if the court had read the document as a whole, it would have found that upon the death of Jeremy, any interest which would have gone to him should pass to his children. One little aspect here, at one point we asserted that the appellee made an argument which had not been raised in the trial court. In the brief, we noted that as of that date, we didn't find anything in the record. Sure enough, preparing for this argument, I found exactly that argument had been made. So we withdraw our waiver argument in that respect. Thank you. Thank you. Ms. Swinney. Thank you, Your Honors. May it please the court. Good morning, Your Honors. I was once told to focus on the issue at hand and then things become clearer. So to do this, you need to take whatever that issue is, break it down into smaller pieces, answer those questions, and then everything should come together. Well, that's what I'd like to do here this morning. So I'd like to lay out what I believe are the two primary issues in this case. The first of which is, who should the deceased beneficiary's heir or the deceased beneficiary's share be paid to, his estate or to his children? Now, that deceased beneficiary is Jeremy Travistad. And second issue would be, were the actions of Suzette Love so egregious that the trial court was required to remove her as co-trustee? So on the first issue, Illinois courts have stated that in construing a will, the question for determination is not what the testator meant to say, but rather what he meant by what he did say. So let's take a look at the two trusts involved here, that of Robert Lackey and of June Lackey. In Robert Lackey's trust, he states, upon my death, if my spouse should survive me, she is to receive the income from my trust during her lifetime. Upon her death, it should be divided into four shares, three of which were to his natural-born daughters, Brenda, Suzette, and Robin. If they survived him, if not, then to their descendants per service. The fourth share was to be given to Robert Lackey's deceased stepdaughter, children, those being his grandchildren. If they survived him, if they did not, then to their descendants per service. Now June Lackey's trust states, upon her death, the income and the remaining principal shall be divided into three shares, one to her daughter, Brenda, one to her daughter, Suzette, and one to the grandchildren from her deceased daughter, Aloha. Now, for Brenda and Suzette, it stated, if they should survive her, if not, then per service. For the grandchildren's share, it stated, if they survive her, if not, then per service and not per capital. So I think it needs to be noted here that when Robert Lackey and June Lackey both passed away, all of the beneficiaries were alive. So under each of these trusts, then, we would then need to determine, when did these beneficiaries' trust pass? Now, if Illinois values inheritances vesting at the earliest possible time, in fact, the downward corp held generally will become effective on the date of the testator's death. And the state's demise will vest on the testator's death unless a later time for vesting is apparent from expressed provisions within the will. So taking this into account, in each of the testator's trusts, or the settler's trust, it contained the language upon death. So that would then lend to the consideration that the beneficiary's interest all vested upon the time of the death of each of the testators. Now, though. Well, these are, just so we're clear here, we're talking about trusts and not wills, right? That is correct. I'm taking your position as if they had to be treated the same way. They do. The courts view both in the same, yes. Now, but then we still have this language within Robert's trust, right, that would sort of call question as to, did the settler really want the inheritance to vest at the time of Robert's trust or June's death? Because of the fact that we have that language in his trust that stated, upon my death, the income shall pass to my spouse until the time of her death. And upon her death, it shall be divided into four shares. But our courts here in Illinois, in fact, the first Galesburg Bank v. Robinson case, which is the third district case decided in 1986, said that wouldn't follow that the inheritance would vest at the time of June's death. It would only hold that the inheritance would be delayed, that the enjoyment or possession of the inheritance by those other beneficiaries would just be delayed until the time of her death. So in other words, in our case, our beneficiaries. What if during her lifetime she consumed it? If she consumed it, then there would be nothing for the beneficiaries to inherit. But still, that inheritance still vested at the time of Robert's death, whatever may be left over after June's lifetime and during her time of being able to use the income. So yeah, it is possible that the beneficiaries may have been left with nothing. That isn't the case here, but that is possible. So now when we look to June's trust, she doesn't have any of that language within her trust. Hers just says upon her death. And so we need to look at that each of those testators wished for their beneficiaries' interest to vest at the time that they passed away. Albeit with Robert, the beneficiaries' enjoyment and possession was delayed until after the death of June Lackey. Now we have the other topic contained within each of the trusts, and that's the language of perservice. Now, Ms. Dack would have this court believe that the understanding of perservice would mean, in our case, that if Jeremy Trammelstad died, his share should automatically begin to be received by his children. But that's a misguided understanding of the term perservice. The term perservice designates the method of determining how the estate should be divided amongst those entitled to share in it. It has no application in determining those entitled to share in it. So, in other words, in our case, perservice would mean this, and we'll use Jeremy as the example. So if Jeremy Trammelstad did not survive Robert Lackey or June Lackey, his share would then pass to his children, and his children would take that share that their parents would have taken. In this instance, Jeremy had two children. So if it were the case that he pre-deceased the testators, those children would share in his share 50-50. That is the whole gist of perservice. Not that somehow during distribution, if the beneficiary dies, suddenly they're divested of their interest, and then someone else begins to take, only that if they were to have pre-deceased the testators, the settlers, would that then pass on to their children or their descendants. Now, the Rooney Court held that when the language of a document is clear and unambiguous,  and in fact, our trial court did say in its memorandum of decision that the terms of the trust were clear and unambiguous, and thus we must let those terms lay as they are and not read into them or try and create some other meaning to them. Our trial court cited the Northern Trust case, and in that case, that court stated there was a powerful reason why the interest vests at the time of death. Any other date would potentially allow the trustees to change the intended income merely by delaying the distribution.  we request that this court affirm the trial court's decision with that issue. Now, we have the second issue, and that is, were the actions of Suzette Mook so egregious that the trial court was required to remove her as co-trustee? Now, within Ms. Zapp's brief, she cites the Dyrdal case. In fact, she says that absent an abuse of discretion, the trial court's refusal to remove a trustee shall not be disturbed. In that Dyrdal case, that court, in fact, went on further to state that not every instance of mistake or neglect on the part of the trustees justifies removal of the trustee, and that only if the trustee endangers the trust fund and removal is clearly necessary to save the trust, should a court remove a trustee. Ms. Zapp further goes on to cite the case of Hawley, and the circumstance in this case is actually quite interesting in that the trustee sold some parcels of real property to his son. The sale of this property affected the life estate holder's income. The court held here that because the sale was to his son, and there's an ongoing relationship there, and because the life estate holder's income was being directly affected by the sale of this property, that they were going to remove the trustee. And they cited that there was an ongoing and a continuing conflict of interest. Now, the complaints of Ms. Zapp with respect to Ms. Mook's actions were that Ms. Mook refused to make distributions, when in fact that's not the case at all. Ms. Mook made all of the distributions with the exception of one, and that was to Jeremy Travelstad. But, as our trial court noted, Ms. Mook took the proper steps to address that issue with respect to that beneficiary by filing an action in interplea, in that the trial court believes that this particular issue of the share to the deceased beneficiary was really the main issue in the case. Two minutes, please. Thank you. Now, within Ms. Zapp's brief, she states that the court stated there was a conflict of interest between Ms. Mook and the beneficiaries. The court never stated that in its memorandum of decision. Now, with respect to the two lawsuits that Ms. Zapp refers to, the first lawsuit that took place between Ms. Mook and her sister, Robyn, was because Robyn forged Ms. Mook's name to a check. That was an insurance check that had nothing to do with the trust. Nothing. The only connection that there was between that lawsuit and the trust was the fact that Ms. Mook's attorney at the time garnished the trust, of which Robyn only had an interest in one of the trusts, and that was Robert's, because Ms. Johnson had been cut out of June Lappy's trust. But that's the only connection there. The other lawsuit regarding Ms. Odera, or she's now known as Ms. Woods, was that Ms. Mook had made a personal loan to Ms. Woods. Ms. Woods had agreed to pay her back out of the proceeds of a payment from the trust. It never happened. That's the only connection between the two. Now, there was one issue, and that was Ms. Mook did, wouldn't agree, to make a distribution of some annuity funds in an effort to try to get her sister to help her finish cleaning up some garages on the real property of the estate. Was there any conflict of interest? No. It was just personalities. They had had enough of each other at that point, and Ms. Mook wanted help from her sister, which she wasn't getting. So, to summarize, none of these issues was an ongoing issue. None of these issues endangered any of the beneficiaries' interests. None of these issues were self-dealing. At no time did Ms. Mook misappropriate anyone's funds. Time. Thank you. I will stand on my brief, Your Honors, for any issues that I was not able to argue, and thank you for your time. Thank you, Ms. Swain. Thank you. Mr. Clark to rebuttal. Thank you. I'm going to try it now, aren't you? Yeah. I didn't have to lock my eyes very often. Okay. I'm sure those that follow you will appreciate your consideration. I know. Your Honor, with respect to the appellee's comments as to distribution, we believe that a later time of vesting was apparent in the trusts, that each beneficiary, in effect, took a life estate, and interestingly, counsel, I believe, noted that a question is what did Robert and June intend? What was their ultimate goal? Well, as we pointed out, reading the agreements as a whole, we believe that the intent is clear. It was meant to keep passing down to their blood descendants. But the language is equally as clear. The actual language, if we're bound by it, we can understand and follow that language. We can't look outside of that. The language is clear that since he survived his grandmother and grandfather, his interest had vested, and so the portion of the trust language that said if he hadn't, it has no meaning because he lived. I mean, he was alive when June passed, so he got his share. Your Honor, that interpretation focuses upon just a couple particular phrases within the document. As we pointed out, if you look at the entire document, you see a different intent. You see an intent that the money continues to pass down to blood relatives. The Persterpe's argument that we made is not the only point we made in this respect. However, we do believe that it is an indication, yet again, that each beneficiary was taking a life estate, and then upon their death, the money went to the next descendants of Robert and June. Persterpe's, taken by representation, which is exactly what we are promoting here. With respect to the Northern Trust case and the gentleman who bought the farm within the trust, in that aspect, the court did note that all reasonable prices had been paid, that it found no, forget the term, forget the term, hanky-panky in what was paid for anything. However, nonetheless, the trustee was removed. We believe that Ms. Mook's arguments here are similar to that, kind of claiming no harm will fall. Well, that's just not the case. Let me ask you this, because the point is, we know that whether or not to remove a trustee is a discretionary call. So, and counsel argues that if, opposing counsel argues that if, for us as a reviewing court to disturb that, we've just pretty much got to say that, gee, as a matter of law, the trial court was wrong. That it abused its discretion. Yes, Your Honor. And so how do we get to, as a matter of law, the trial court was wrong in refusing to remove the trustee? I apologize, I didn't hear your question. How do we, as a reviewing court, get to, as a matter of law, this trial court should have removed the trustee, the co-trustee? Well, the pursuit of authority on this point, since all that's required is an appearance of impropriety or the possibility of a conflict of interest. Where here, we went far beyond that. You know, counsel made one comment about that Mook ultimately made all the distributions, except the one involving Jeremy. That's true, but there were many times that she delayed it. Anytime you have a trustee or a co-trustee who's also a beneficiary of the trust, don't you have the appearance, or at least for a conflict of interest, because that trustee would, that person would probably like a bigger share if they could figure out a way to get it. In that extended of a concept, I would imagine the court is correct. However, at a practical level here, we are in fact looking at a true indefinite conflict of interest. For these reasons, we ask, please, that the judgment of the circuit court be reversed. And as to arguments I haven't raised here, we stand on our briefs. All right. Thank you. Thank you, Mr. Clark. Ms. Swinney, thank you also. I'll give you a minute if you want to join driving down there, and this matter will be taken under advisement. A written disposition will be issued, and when we're done. Then it will be in a brief recess for a panel.